201, 206 (W.D.N.Y. 1991)); *see also Green v. Am. Express Co.*, 200 F.R.D. 211, 212 & n.1

(S.D.N.Y. 2001) (discussing circumstances in which notice under Rule 23(e) is unnecessary). If

a court may, under appropriate circumstances, dispense with notice of a settlement to certified

class members under Rule 23, and dispense with notice of the settlement of a derivative action to

corporate shareholders under Rule 23.1(c), then perforce this Court has the discretion and

flexibility to dispense with notice to shareholders with respect to the settlement of an action

under Section 16(b), especially since Section 16(b) does not contain any express notice

requirement similar to the ones found in Rules 23 or 23.1.

### III.   ASSUMING THE *GRINNELL* FACTORS APPLY, THEY SUPPORT THE FAIRNESS, ADEQUACY, AND REASONABLENESS OF THE SETTLEMENT

The Settlement Agreement would satisfy the criteria for approval of a settlement even if

the litigation were subject to Rule 23.1. Rule 23 provides that a class action may not be settled

unless the court finds the settlement "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

In *City of Detroit v. Grinnell Corp.*, the Second Circuit described the factors a court should

consider in making this determination:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction
> of the class to the settlement, (3) the stage of the proceedings and the amount of
> discovery completed, (4) the risks of establishing liability, (5) the risks of
> establishing damages, (6) the risks of maintaining the class action through the
> trial, (7) the ability of the defendants to withstand a greater judgment, (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery, (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger*

*v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re IPO Sec. Litig.*, 260 F.R.D. 81,

88 (S.D.N.Y. 2009) (Scheindlin, J.) (quoting the *Grinnell* factors).

In addition to the factors listed above, the *Grinnell* inquiry has a separate but related

procedural component, which looks to "the negotiating process leading to settlement." *Wal-Mart*

*Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 112 (S.D.N.Y. 1999) (Scheindlin, J.) (referring to this as the "second prong" of the analysis).  The Court should satisfy itself that negotiations were "conducted at arm's length, and [that] class counsel have engaged in sufficient discovery of the claims." *Polar*, 187 F.R.D. at 118; *see also Grinnell*, 495 F.2d at 465-66 (evaluating the procedural fairness and adequacy of settlement negotiations).  "'A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *In re IPO Sec. Litig.*, 260 F.R.D. at 87 (quoting *Wal-Mart Stores*, 396 F.3d at 116).

Although the *Grinnell* factors are geared toward class action settlements, this Court has applied them to a handful of cases under Section 16(b).  In so doing, the Court has modified the factors in two respects.  First, the Court has eliminated the sixth factor, which relates to the risk of maintaining the class action through the trial.  *See, e.g.*, *FTR Consulting Group*, 2005 U.S. Dist. LEXIS 20013, at *6-*7 & n.2.  Second, the Court has fashioned an additional factor, which looks to "the congressional purpose to cause disgorgement of short-swing trading profits by corporate insiders in favor of the corporation of which they are fiduciaries." *Id.* at *7 (quoting *GE Capital*, 2001 U.S. Dist. LEXIS 13099, at *18-*19).

In applying the *Grinnell* factors, the Court should remain mindful that "[p]ublic policy, of course, favors settlement." *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (SWK), 2006 U.S. Dist. LEXIS 63260, at *7 (S.D.N.Y. Sept. 6, 2006) (citing *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996)); *see also In re IPO Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) (Scheindlin, J.) (" [I]t is axiomatic that the law encourages settlement of disputes.") (quoting *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir.

-11-

2001) (alteration added)).  Thus, while the Court should conduct an "'independent evaluation'" of the parties' settlement, it must "'stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 329 & n.72 (S.D.N.Y. 2005) (Scheindlin, J.) (quoting *Grinnell*, 495 F.2d at 462); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575-76 (S.D.N.Y. 2008) ("[T]he court should not substitute its judgment for those of the parties who negotiated the settlement . . . .").

### A.    The Negotiating Process Entitles the Stipulation of Settlement to a Presumption of Fairness, Adequacy, and Reasonableness

The parties' settlement easily satisfies the procedural component of the *Grinnell* analysis. The parties, over a period exceeding four months, prepared technical analyses of the trading engaged in by the Settling Defendants.  These included summaries of relevant parts of the 6,000 pages of trading records generated by the Settling Defendants and the competing interpretations of the complex rules which each side urged were applicable.  Apart from the soporific nature of the debate, the opening gambit of the Settling Defendants (offer of 3.7 million) and the counter of the plaintiffs (23 million), each displaying zealous advocacy, represent a sharply contested negotiation between counsel who, in each face to face negotiation, numbered 4 attorneys on plaintiffs' side of the table, five on the defense side and one representing Achillion.  Many more negotiations enriched the telephone and internet carriers and FedEx.  Counsel bargained hard for their clients and agreed to settle only after satisfying themselves of the legal and factual risks of litigation.

Among counsel for the RA Capital Parties was Alan Dye, whose co-authored treatise, *Section 16 Treatise and Reporting Guide* is likely on the Court's chambers bookshelf.  No slighting of the reputations and abilities of other distinguished counsel for the Settling Defendants or for Achillion is intended.  The qualifications and reputations of Messrs. Lopez,

-12-

Ostrager and Wexler, appearing for the plaintiffs in Section 16(b) litigation are reported in the Fourth Edition at pages 870-871 of Mr. Dye's treatise. Plaintiffs' fourth attorney, Ronald Tauber, is a former partner of Strook & Strook & Lavan and of Goldman Sachs and brings to the case special expertise in market trading practices.  Miriam Tauber is a former Skadden Arps associate with considerable experience in complex litigation.

Both sides were ably represented by attorneys who are among the foremost in the specialized field of short-swing trading, who analyzed and bargained to the peak of their abilities and responsibilities.

### B.   The Terms of the Settlement Agreement Satisfy the Substantive *Grinnell* Factors

#### 1.   *Grinnell* Factor One: The Complexity, Expense, and Likely Duration of Litigation

All counsel, defense, plaintiffs' and Achillions' vouch for the extreme complexity of the legal and factual issues present in this case.  The volume of trading engaged in by the Settling Defendants in shares and derivative securities of Achillion during periods of less than six months (6,000 pages of trading records), in itself, makes this a physically complex case.  Add to that the employment of hedging strategies involving in-the-money and out-of-the-money derivatives, and that SEC rules applicable to derivatives equate entry and exit from such positions to the purchase and sale of underlying shares (with valuations subject to at least two measurements), and the resulting morass of possible permutations can be exponential.  It may not be Avogadro's number but it certainly isn't back-of-the-envelope arithmetic either.

There is exactly one district court case shedding some light on a possible valuation approach, Judge Kimba Wood's decision in *Donoghue v. Novastar,* 04 Civil 6857 (KMW).  We are not aware of any appellate guidance.

In the plaintiffs' First Amended Complaint we present our best estimate of plaintiffs' best case. Determining whether, by trial or by dispositive motion, that view would carry the day is a question that cannot be answered short of court decision and appeal.

It is a small measure of the difficulties this case presents that the Settling Defendants, with premier counsel and all good intentions, could not analyse their position through more than four months of discussion with plaintiffs' lead counsel and counsel to Achillion prior to producing their opening negotiating gambit.

If litigated to conclusion this is easily a multi-year and very expensive case.

### 2.    *Grinnell* Factor Three: The Stage of the Proceedings and Extent of Discovery

"This factor is aimed at ensuring that the parties have a 'thorough understanding of their case' prior to settlement." *In re IPO Sec. Litig.*, 260 F.R.D. at 114 (Scheindlin, J.) (quoting *Wal-Mart Stores*, 396 F.3d at 118). The amount of discovery necessary to assess a case depends on how fact-dependent it is, so the Courts have refused to fix a hard threshold for acceptable discovery. To the contrary, they have said repeatedly that a *Grinnell*-compliant settlement can occur even before formal discovery has begun. *See, e.g., In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004); *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2012 U.S. Dist. LEXIS 86513, at *35 (S.D.N.Y. June 20, 2012); *see also In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *20 (S.D.N.Y. May 1, 2008) (collecting cases). The Courts ask only for "a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002).

The principal factual discovery required for this case to be settled was of the trading records of the Settling Defendants. Their counsel provided summaries and analysis which were a basis for initial discussions, and some 6,000 pages of confirmatory trading records. The latter have been reviewed by plaintiffs' counsel and have given them comfort in relying on the prior representations of counsel to the Settling Defendants.

All discovery necessary to address the legal issues has been conducted. It is the legal issues applicable to the facts so established that present great difficulties. A huge number of analytical permutations are present and it is they that have impelled pragmatic settlement negotiations.

### 3.   *Grinnell* Factors Four and Five: The Risks of Establishing Liability and Damages

Liability is not in dispute. The amount and manner of computation of damages are.

We are navigating largely uncharted waters. As stated in the previous section, there is exactly one district court opinion, none at the appellate level, addressing, however tangentially, the issues of this case. Counsel to the parties each cite SEC Releases and Rules for methods of determining valuations of derivative transactions , of the shares underlying those transactions and of how they might be matched against other derivative transactions and/or transactions in underlying shares. The competing views may just possibly be biased by the distortions of zealous representation .

The disparity between the Settling Defendants' "opening bid" of 3.7 million and the plaintiffs' First Amended Complaint demand of 23 million defines the positions and the gap that has been closed by negotiations leading to the Stipulation of Settlement now before the Court.

The risks of arriving at a damages figure equal to or in excess of the settlement amount are nearly imponderable without trying every disputed issue and theory of law. We think this is a better way.

4.    ***Grinnell*** **Factors Eight and Nine: The Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation**

The proposed recovery of $10,400,000 amounts to approximately 45% of the maximum recoverable short-swing profits sought in the First Amended Complaint, an impressive achievement by the standards of securities litigation. In its most recent survey, Cornerstone Research found that, in cases with estimated damages of less than $50 million (the lowest range for which Cornerstone disaggregates data), the median settlement recovered only 10.3% of estimated damages.* When all cases are considered, that figure falls to 2.1%. *See id.* Cornerstone's sample is limited to securities fraud cases, *see id.* at 21, which offer defenses not available under the strict liability of Section 16(b). Still, the stark difference between the percentage recovery in this case and in securities litigation generally implies that the Settlement Agreement at least falls within the "range of reasonableness."

5.    ***Grinnell*** **Factor Seven: The Ability of the Defendants To Withstand a Greater Judgment**

The Company stands to recover at most $23 million in this case on plaintiffs most optimistic hopes. The Settling Defendants, although private and non-reporting, could likely weather that liability. But the size of defendants' wallets is not a measure in this case of what may reasonably be sought by plaintiffs. The case's validity is the true measure of what is reasonably due once the solvency of the defendant is out of the picture. Ability to pay is not and was not a consideration in the settlement agreed in this case.

6.   **The Congressional Purpose To Cause Disgorgement of Short-Swing Trading Profits**

This factor only applies to Section 16(b) settlements.  The Courts added it to the mix in

*Levy ex rel. Marketing Services Group, Inc. v. GE Capital Corp.*, No. 99 Civ. 10560 (AKH),

2001 U.S. Dist. LEXIS 13099, at \*18-\*19 (S.D.N.Y. Aug. 30, 2001).  Judge Hellerstein who

wrote the opinion in *GE Capital*, did not explain how to apply this factor, though he described it

as having "considerable importance." *Id.* at \*18.  His opinion suggests that the Court was

concerned about settlements (including the one before him) that provided only non-pecuniary

benefits. *See, e.g., id.* at \*24 (rejecting the "intangible values" of the settlement and opining that

"[t]he settlement proffered to me has not been shown to create one dollar of real value").

That view makes sense given the congressional purpose behind Section 16(b) of

preventing the unfair use of information which may have been obtained by [an insider] by reason

of relationship to the issuer." 15 U.S.C. § 78p(b).  This deterrent would be disserved if insiders

could disgorge short-swing profit in the form of "coupons" or similar non-pecuniary assets.

Even if the issuer's stakeholders were happy to receive coupons, cashless disgorgement would

soften the blow to the defendant and reduce the statute's deterrent effect.

That is not a concern with the settlement negotiated by the parties here.  Unlike the deal in *GE*

*Capital*, the Settlement Agreement gives the issuer the most real and tangible of benefits: cash.

Moreover, plaintiffs' attorneys are not taking "better care of [themselves] . . . than those [they]

represent[]." *GE Capital*, 2001 U.S. Dist. LEXIS, at \*26 n.16.  The agreement provides

---

\* *See* Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, Securities Class Action Settlements:  2011 Review and Analysis 7 (2012), *available at* http://www.cornerstone.com/files/Publications/a0e54ba8-2830-4cc00-9481108208ec4ed8/Presentations/Publication Attachment/f03e4174-ec8a-4eb3-ba22-19bd5162f09e/Cornerstone_Research_Settlements_2011_Analysis.pdf; *se3e also In re Veeco Instruments Sec. Litig.* No. 05 MDLa 1695 (CM), 2007 U.S. Dist. LEXIS 85629, at \*34\*35 (S.D.N.Y. Nov. 7, 2007).

that attorney's fees are paid only after, and out of the disgorgement. These terms satisfy the deterrent purpose of the statute, and they militate in favor of approving the settlement.

## IV.   THE LEGAL FEES AND DISBURSEMENTS AGREED TO ARE FAIR AND REASONABLE

Achillion, represented by John Batter of Wilmer Cutler Hale and Dorr, LLP, has agreed that plaintiffs' counsel, who discovered this case and litigated it on a contingent basis, have provided a real and measurable benefit to the company which has resulted in a proposed payment of $10,400,000. In negotiations conducted after settlement Achillion agreed to support plaintiffs' requested counsel fees of $1,456,000, which include disbursements (other than the cost of shareholder notice should that be required). That amount is 14% of the recovery and payable directly by the Settling Defendants from the gross settlement. It is well within the range of fees routinely awarded in common fund cases in this Circuit and elsewhere. *See: In re Warner Communications Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985) where Judge Keenan noted that fee awards in this district and others are generally between 20% and 50% of the common fund.*

### The Agreement Between Plaintiffs' Counsel And Achillion Should Be Given Great Deference

The negotiation at arm-length of plaintiffs' fees after settlement was a common sense attempt to have the persons closest in knowledge to the proceedings have a go at resolution of this last aspect of the case. The Second Circuit has cautioned that the courts should be hesitant to interfere in fee arrangements between plaintiffs and defendants in shareholder actions when defendants have agreed not to oppose -- or by extension, agreed to support -- the payment of stipulated fees:

> "[W]here ... the amount of the fees is important to the party paying them, as well as to the attorney recipient, its seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to the completion of the settlement, because the defendants want

to know their total maximum exposure and the plaintiffs do not want to be sandbagged.  It is difficult to see how this could be left entirely to the court for determination after settlement." *Malchman v. Davis*, 761 F.2d 891, at 905, fn 5 (2d Cir. 1985).

*See, also: Court Awarded Attorney's Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 267 (1985) (cited in *Evans v. Jeff D.,* 475 U.S. 717, 738 n. 28 (1986); *In re Quest Software, Inc. Deriv. Litig.* No. SACV06-763, Order Granting Final approval of Settlement at 6 (C.D. Cal, Aug. 15, 2008) ("... a stipulated fee is entitled to considerable deference " and "judicial meddling in stipulated fee agreements is dangerous and discourages settlements".)

Achillion goes beyond "not opposing" the requested fee.  It has stipulated to "support" this application (Par. 6 of Settlement Stipulation).

**Applicable Standards**

A request attorneys' fees in a successful shareholder suit is assessed by applying a handful of factors, unevenly weighted as circumstances warrant.

        **1. Benefit Conferred**        Of all factors relevant, Plaintiffs urge that the benefit conferred -- objectively measurable in this case by dollars to be recovered -- should

---

\* A small sampling of fee decisions in the district includes: *Krome v. Merrill Lynch & Co.,* 85 Civ. 765 (DNE) (S.D.N.Y. May 7, 1991) (Edelstein, J. 33%); *In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588 (S.D.N.Y.) 1992 (court awarded 30% of a \$34 million settlement fund finding the fee requested to be "eminently reasonable"); *In re Allister Inns Sec. Litig.,* 88 Civ. 9282 (PKL) 12991 U.S. Dist LEXIS 20402 (S.D.N.Y. Nov. 20, 1991) (Leisure, J. 35%); *Bello v. Integrated Resources, Inc.,* [1990-1991 Transfer Binder) Fed. Sec. L. Rep] (CCH) Par. 95,731 (S.D.N.Y. 1990 (Haight, J. 30%); *In re New York City Mun. Sec. Litig.,* [1984 Transfer Binder) Fed. Sec. L. Rep (CCH) Par. 91,419 (S.D.N.Y. 1984) (Owen, J. 30%); *Schaffer v. Soros, et al.* 1994 WL 381442 (S.D.N.Y. 1994 McKenna, J.) (awarding 33 1/3 of 7.9 million settlement of a Section 16(b) case); *Adair v .Bristol Technology Systems, Inc.,* 97 Civ. 5874 (S.D.N.Y. Order dated Nov. 12, 1999) (Sweet, J. 33 1/3 of \$975,000 settlement).

weigh most heavily in a case solely about the recovery of money damages in a windfall setting. Achillion suffered no actual damage for which it is being compensated. Rather, as in all Section 16(b) cases, it is the gratuitous recipient of a statutory forfeiture intended to protect the integrity of the marketplace for publicly traded securities. This is found money and the plaintiffs are the finders. "The most important factor in determining the reasonableness of a fee is the degree of success obtained", *Pino v. Pocasio*, 101 F.3rd 285 (2nd Cir. 1996).

The settlement provides for a recovery from the Settling Defendants aggregating $10,400,000. It is all cash. There are no difficult-to-value assets, no coupons, no rights or intangibles whose worth are matters for subjective evaluation.

Here, through the negotiation at arms-length of a fixed percentage fee after the amount of settlement had been fixed, a firm dollar amount has been agreed. It is in the neighborhood of one half the "custom and practice" of the District. Its modesty is a tribute to the skill of Achillion's counsel on his client's behalf and to the willingness of plaintiffs' counsel to see the litigation come to a speedy conclusion.

### 2.    Contingent Nature of the Fee and Risks of Litigation

The contingent nature of the fee and the risks of having plaintiffs' counsel be left empty-handed at the end of litigation is a significant factor in assessing this application. "Perhaps the foremost of [all] factors is the attorney's 'risk of litigation', i.e. the fact that despite the most vigorous and competent efforts, success is never guaranteed". *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974). *See: In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987). "[A] multiplier takes into account the realities of legal practice by rewarding counsel for those successful cases in which the probability of success was slight yet the time invested in the case was substantial."

We divert into the thoughts expressed by the New York State Court of Appeals, not as controlling precedent but as a common sense discussion of the topic. In *Graubard v. Miller*, ... N.Y. 3d ..., ...N.Y.S. 2d ..., 2008 WL 5055393 (December 2, 2008) it wrote:

> "[It] is not unconscionable for an attorney [retained on contingency] to recover much  more than he or she could possible have earned at an hourly rate [and if] courts become too preoccupied with the ratio of fees to hours, contingency fee lawyers may run up hours just to justify their fees, or may lose interest in getting the largest possible recoveries for their clients." *Id.*

The risks of this litigation are exemplified by its history.  If the court will examine the time records of the author of this brief, David Lopez, at Exhibit B to his affirmation, you will note that the original demand in this matter was made in November of 2013.  Former counsel to the RA Capital Parties made representations that, taken at face value, persuaded both Achillion and me to close the case.  In August of 2014, retroactive reports of additional activity by the RA Capital Parties were made that altered the picture.  Their entry into insider status appeared to have to have occurred earlier than previously suspected and massive trading appeared to have taken place in the interim.  Picking up on the discrepancy between prior and later reporting the plaintiffs undertook to work their way through complex and nearly unprecedented issues of fact and law.  Had this case gone to trial and appeal it would be the textbook citation of law on issues now unexplored in the literature.

**3.     Magnitude and Complexity of the Action**

In order to avoid redundancy plaintiffs respectfully refer the Court to our earlier comments for a discussion of the complexity and magnitude of the case and to the fact that all counsel involved will testify, if called upon, to the difficulty they encountered in finding daylight in the facts and law of the case.

### 4.    Quality of Representation

Quality of representation, which is another way of saying the demonstrated competence of counsel, is a salient consideration. *Grinnell, supra* at 471;  *Union Carbide,* 724 F. Supp. at 163.

Romeo and Dye (yes, that Dye), in their *Section 16 Treatise,* their *Section 16 Handbook,* in their newsletter and in their lectures have described David Lopez, from time to time, as "pre-eminent in the field".  I am an honors graduate of Cornell University (1963) and of Columbia Law School (1966) and have litigated shareholder suits as a member of the bar of this court since 1970.  I am a member, in addition, of the bar of the State of New York, of U.S. District Courts for the Eastern, Western and Northern Districts of New York and of the Districts of Vermont and Colorado and have been admitted *pro hac vice* to the bars of approximately 25 U.S district courts.  I am a member of the bars of the First, Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits and of the Supreme Court of the United States.

Ronald Tauber is an honors graduate of Brooklyn College (1965) and of Harvard Law School (1968) and is a former partner of Strook & Strook & Lavan and of Goldman Sachs.  His expertise is in public capital markets, derivatives trading, contracts and securities and commodities law and regulation.  He is a member of the New York  Bar and of the bars of the Southern and Eastern Districts.

Glenn Ostrager is a graduate of  St. John's University Law School (1977)  and a partner at Ostrager Chong Flaherty & Broitman, PC.

Paul Wexler is a graduate of New York University School of Law (1973) and counsel to Kornstein Veisz Wexler & Pollard LLP.

Messrs. Ostrager and Wexler have jointly litigated scores of cases under Section 16(b) which have produced tens of millions of dollars in disgorged profits. Their cases have resulted in many reported decisions in the District Courts and Courts of Appeal. As Judge Stark wrote in *Segen v. Options Express*, 631 F. Supp 2d 465 (D.Del. 2009): "no one disputes that Plaintiff's counsel {Ostrager and Wexler} are experienced Section 16(b) lawyers with a history of achieving significant disgorgements [citations omitted]" They are long-time member of the New York Bar, the bar of this Court, the Second Circuit Bar and the bars of numerous federal courts through the nation. They, too, have been recognized in the Romeo and Dye treatise.

Miriam Tauber is a *summa cum laude* and *phi beta kappa* graduate of the University of Pennsylvania and of the University of Pennsylvania School of Law. She is a former senior litigation associate at Skadden Arps Slate Meagher & Flom with much experience in complex litigation. She is a member of the bar of the State of New York, the Second Circuit, the Southern and Eastern Districts of New York and has been admitted *pro hac vice Ito* eight Federal District Court bars.

The theories of liability and of damages in this case have been novel, creative and largely unprecedented.

The celerity with which this case has progressed from demand to suit to the settlement now before the court speaks volumes for the clarity of the analysis of plaintiffs' counsel. Responsive pleading have not been deemed necessary nor has the court been burdened with the need to intervene.

Plaintiffs' counsel submit that their competence has met the test of adequacy.

### 5.    The Lodestar Approach

It is the central thesis of this application that the Lodestar approach (hours spent multiplied by an hourly rate), in the circumstances of this case, should be given slight weight. "The critical inquiry when reviewing hours billed to the common fund ... is whether the work performed resulted in a benefit ...." *Agent Orange Prod. Liab.*, 818 F.2d at 237.

In *Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) Judge Posner reversed the trial court's *Lodestar* award and criticized the judicial attempt to set a value on lawyer services mechanistically:

> "It is apparent what the district judge's mistake was.  He though he knew the value of the class lawyer's legal services better than the market did ....  He may have been right in some ethical or philosophical sense of 'value' but it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Id.* at 568.

It is inappropriate "to determine the value of a service that the market has set its own value on" by reference to hourly rates, and it is error not to award a premium "in order to reflect the risky character" of a representative action. *Id.* at 569.  The virtue of negotiation of a fair fee by the paying party and the receiving party is that "[m]arkets know market values better than judges do." *Id.* at 570.

The requested fee has, indeed, been set by the market, a market consisting of Achillion as sole purchaser of services in the circumstances.  Represented by a prominent, well-reputed and prestigious law firm, Achillion has struck a bargain with plaintiffs' counsel after careful and adversarial negotiations, informed by the familiarity of Achillion's counsel with all case events, many of which he attended and by advice and mediation of counsel to the Settling Defendants.

The 822.70 hours expended by plaintiffs' counsel multiplied by their respective non-contingent hourly rates, ranging from $450 to $850, yield a so-called *lodestar* of $605,731.25. The agreed fee is roughly 2.4 times the *lodestar*. The use of a substantial multiplier to achieve a just result has ample precedent.*

We ask the court to consider that every hour of the time of plaintiffs counsel expended on this case has produced $ 12,598.00 more or less, of benefit to Achillion.

### 6.   Public Policy

The statute under which this suit has been brought is an expression of a public policy against short-swing trading and the possible use of inside information to trade against a less-well-informed public.  It has withstood, in the words of Professor Louis Loss, "a hearty detestation" among those of the sporting gentry subject to it for the 81 years of its existence.

The Congress has revisited the statute's utility and method of enforcement several times during its lifetime, aided by Securities & Exchange Commission studies and recommendation, and each time it has ratified it through tweaking and expansion, not by repeal.

This action is based on the law.  It is clearly within it.  It is brought in the manner and for the purposes Congress intended.  And it advances the public policy that the statute was intended to embody.

------

* *In re Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.* 778 F.2d 890 (1st Cir. 1985) (multiplier of 6); *Weiss v. Mercedes Benz Inc.,* 899 F. Supp. 1297 (D.N.J. 1995), (multiplier of 9.23);  *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass. 1998) (multiplier of 8.9); *In re Beverly Hills Litig.*, 639 F. Supp. 915 (E.d. Ky. 1986) (multiplier of 5)..

The settlement before the court is an excellent resolution of an extraordinarily complex case raising many unprecedented issues. It has been resolved through exploration and negotiation among leading practitioners in the field collegially and without acrimony. The efforts of plaintiffs' counsel, for which payment in an agreed amount is sought, produced an outstanding result with a speed unusual in securities litigation and with little burden on the court. It is fully supported by Achillion, the beneficiary of plaintiffs' efforts, and even by all defendants. The settlement should be approved and the agreed fees awarded.

Dated: July 1, 2015
        Southampton, New York

/s/ David Lopez

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2015 I caused a true and correct copy of the foregoing

Memorandum of Law in Support of Settlement Approval and Attorneys' Fee Award to be served

on each person who has appeared as counsel by filing the same through the Court's CM/ECF

system.

Dated: July 1, 2015
        Southampton, New York

/s/  David Lopez